**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **THE CHARTER OAK FIRE INSURANCE COMPANY,** | |
| **Plaintiff,** | |
| **v.** | **1:12-cv-3949-WSD** |
| **VICTOR W. PATTERSON, et al.** | |
| **Defendant.** | |

## OPINION AND ORDER

This matter is before the Court on: 1) Emergency Water & Fire Restorations, Inc.'s ("EWF") Motion to Enforce Settlement [69] ("Settlement Motion"); 2) The Charter Oak Fire Insurance Company's ("Charter Oak") Motion for Summary Judgment [96]; 3) Charter Oak's Motion to Strike Defendants' Expert [102] ("Expert Motion"); 4) Charter Oak's Motion to Strike Affidavits of Larry Holcomb and Walter Miller [126] ("Charter Oak Affidavit Motion"); and 5) Genevieve Patterson's and Victor W. Patterson's (the "Pattersons") Motion to Strike Affidavit of Emily Watson and Sheriff's Service Notice from Four Seasons on Lanier Homeowners Association, Inc. [133] ("Pattersons Affidavit Motion").

## I.     BACKGROUND

Charter Oak issued an insurance policy to the Pattersons, Policy No. 977068522 633 1 (the "Policy"), effective September 30, 2010 to September 30, 2011.  (Charter Oak Statement of Material Facts [96-2] ("SOMF") ¶ 1).  The Policy provided insurance coverage for the property located at 6419 South Creek Court, Flowery Branch, Georgia 30542 (the "Property").  (Id.).  The Pattersons began residing in the Property on or after October 2004.  (SOMF ¶ 2; Pattersons' Responses to SOMF [123] ¶ 2).  In October 2008, Defendant Victor Patterson purchased property located at 2382 Old Fountain Road, Lawrenceville, Georgia 30043 (the "Old Fountain Property").  (SOMF ¶ 12; Responses to SOMF ¶ 12).

On or about April 13, 2011, a fire occurred at the Property (the "Fire").  (SOMF ¶ 3).  The Pattersons submitted an insurance claim for damages to the Property, damages to their possessions, and for reimbursement of additional living expenses they incurred following the Fire.  (SOMF ¶ 4).  The Pattersons maintain that they resided at the Property at the time of the Fire with two adult children and two grandchildren.  (SOMF ¶ 5; Responses to SOMF ¶ 5).

EWF was hired to make repairs to the Property and to clean the Pattersons' personal property.  (SOMF ¶¶ 7-9; Responses to SOMF ¶¶ 7-9).[1]  Charter Oak issued a check in the amount of $51,469.92 made payable to the Pattersons and EWF for the cleaning of the Pattersons' personal possessions.  (SOMF ¶ 8; Responses to SOMF ¶ 8).  The Pattersons refused to negotiate the check issued by Charter Oak for EWF's services, claiming that EWF failed to properly clean their possessions and damaged some of them.  (SOMF ¶ 9; Responses to SOMF ¶ 9).

On November 12, 2012, Charter Oak filed its Complaint [1] against the Pattersons.  Charter Oak alleges that it paid the Pattersons pursuant to the Policy: 1) $93,291.75 for damages to the Property; 2) $51,469.92 for damages to the Pattersons' personal possessions located at the Property; and 3) $71,491.03 for the Pattersons' additional living expenses.  (See Complaint [1] ¶¶ 12, 14, 17).  Charter Oak seeks a refund of all the payments it made to the Pattersons based upon the Pattersons: 1) not residing at the Property at the time of the Fire; and

---

[1]   The Pattersons admitted to hiring EWF in their Answer, Affirmative Defense and Counterclaim [18] ("Counterclaim"), but appear to deny directly hiring EWF in their Responses to the SOMF.  (Counterclaim ¶ 14; Responses to SOMF ¶ 7).  In their Responses to the SOMF, the Pattersons assert that Charter Oak arranged for EWF to conduct the repairs.  (Responses to SOMF ¶ 7).  Whether the Pattersons directly hired EWF or not, it is undisputed that it was the Pattersons' obligation to pay EWF for its services.

2) fraudulently claiming additional living expenses not actually incurred.

(Complaint ¶¶ 20-31).[2]

On January 31, 2013, the Pattersons filed their Answer, Affirmative Defense and Counterclaim.  The Pattersons asserted a breach of contract and bad faith claim against Charter Oak.  (Counterclaim ¶¶ 43-61).[3]  On April 3, 2013, EWF filed an amended answer to add crossclaims for breach of contract, conversion, quantum meruit and unjust enrichment against the Pattersons for their failure to pay EWF for the work it allegedly performed [35] ("EWF Crossclaim").  On April 17, 2013, the Pattersons filed their answer to EWF's Crossclaim and their counterclaims against EWF for breach of contract and unjust enrichment for failing to properly clean the Pattersons' personal properly [38] ("Pattersons Counterclaim").

---

[2]     Charter Oak also identified EWF, and BAC Home Loans Servicing, LP (n/f/a Bank of America) ("BOA"), the Pattersons' mortgage company, as defendants.  Charter Oak sought a preliminary injunction to prevent the Pattersons from negotiating the $51,469.92 check to EWF pending a determination from the Court regarding whether Charter Oak was entitled to a refund of the Policy proceeds.  (Complaint ¶¶ 33-35).  Charter Oak subsequently dropped its objection to a release of these funds to EWF, reserving its right to claim recoupment of those funds from the Pattersons.  All of Charter Oak's remaining claims are against the Pattersons.

[3]     The Pattersons filed an amended Answer, Affirmative Defense and Counterclaim [37] on April 22, 2013, asserting the same claims.

On July 3, 2013, EWF filed its Settlement Motion, asserting that counsel for the Pattersons and counsel for EWF reached a settlement of their respective claims that the Pattersons have refused to execute or honor.[4]

On February 20, 2014, Charter Oak filed its Expert Motion, seeking to prevent Defendant Victor Patterson, a certified public accountant, from testifying as an expert witness.  Charter Oak asserts that Defendant Victor Patterson has a financial interest in the outcome of the case and is thus unreliable, and should be excluded as an expert witness.[5]

On February 20, 2014, Charter Oak filed its Motion for Summary Judgment, asserting that the Pattersons are not entitled to retain any payments made pursuant to the Policy.[6]  Charter Oak asserts that the Policy: 1) does not provide coverage because the Pattersons were not residing in the Property at the time of the Fire; 2) does not provide coverage because the Pattersons made material misrepresentations to Charter Oak during its investigation of the

---

[4]    On July 22, 2013, the Pattersons filed their Response in Opposition [75] to the Settlement Motion, and on July 24, 2013, EWF filed its Reply [78] in support of its Settlement Motion.  On January 21, 2014, the Pattersons filed their second Response [95] to the Settlement Motion.

[5]    On March 21, 2014, the Pattersons filed their Response in Opposition [119] to Charter Oak's Expert Motion.

[6]    In addition to the supporting exhibits included in Docket No. 96, on February 20, 2014, Charter Oak filed exhibits in support of its Motion for Summary Judgment in Docket Nos. 97-99 and 103-115.  On August 18, 2014, Charter Oak filed a corrected Exhibit O [137].

claim -- specifically: a) where they resided and; b) their claim for additional living expenses incurred as a result of the Fire.[7]

On April 21, 2014, Charter Oak filed its Affidavit Motion, seeking to strike the affidavits of Mr. Larry Holcomb ("Holcomb") and Mr. Walter Miller ("Miller"), which the Pattersons rely upon in their opposition to Charter Oak's Motion for Summary Judgment.[8]

On May 14, 2014, the Pattersons filed their Affidavit Motion, seeking to strike Ms. Emily Watson's ("Watson") affidavit and the Sheriff's Service Notice from Four Seasons on Lanier Homeowners Association, Inc. (the "Sheriff's Notice").[9]

---

[7]     On April 4, 2014, the Pattersons filed their Response in Opposition [122] to the Motion for Summary Judgment, their Response [123] to Charter Oak's Statement of Material Facts, and their exhibits [125] in support of their Response in Opposition.  On April 21, 2014, Charter Oak filed its Reply [128] in support of its Motion for Summary Judgment.  On May 14, 2014, the Pattersons filed their Supplemental Response [131] to the Motion for Summary Judgment, and on May 29, 2014, Charter Oak filed its Reply in Opposition [136] to the Supplemental Responses.
[8]     On May 15, 2014, the Pattersons filed their Response in Opposition [134] to Charter Oak's Affidavit Motion.
[9]     On May 29, 2014, Charter Oak filed its Response in Opposition [135] to the Pattersons' Affidavit Motion.

## II.    DISCUSSION

### A.    Charter Oak Affidavit Motion and Pattersons Affidavit Motion

Both Charter Oak and the Pattersons seek to strike evidence that the other party relies upon in support of, or in opposition to, Charter Oak's Motion for Summary Judgment.  The Court, before considering the Motion for Summary Judgment, must rule on the Charter Oak Affidavit Motion and the Pattersons Affidavit Motion.

Charter Oak seeks to strike the affidavits of Holcomb, a former tenant at the Old Fountain Property who lived there at the time of the Fire, and Miller, a friend of the Pattersons.[10]  Charter Oak asserts that the affidavits should be struck on the grounds that Miller was not identified as an individual likely to have discoverable information regarding the claims and defenses in this case, and that Holcomb's affidavit, executed in November 2013, was not produced prior to the January 20, 2014 discovery deadline.  The Pattersons assert that the affidavit of Watson, a woman who lived in the same neighborhood as the Pattersons, and the

---

[10]    Both Holcomb and Miller aver to facts that support the Pattersons' claim that they resided at the Property at the time of the Fire.

Sheriff's Notice should be stricken because both were available, but not produced, prior to the January 20, 2014 discovery deadline.[11]

Holcomb and Watson were identified in the parties' initial disclosures as individuals likely to have relevant knowledge of certain aspects of this case. Miller was not identified in the Pattersons' initial disclosures. The Pattersons assert that Miller approached them after the close of discovery and asked if he could assist them, that he had personal knowledge of their residence, and that they could not have disclosed him any earlier. (Response [134] pp. 2-3). The Pattersons state that Miller is available to be deposed by Charter Oak. (Id. p. 3).

In form, affidavits resemble documents. In substance, however, they are testimony. "Put differently, witnesses testify orally at trial. Their prior [affidavits], if any, evaporate for all practical purposes and are made part of the evidentiary record only via impeachment." Intel Corp. v. VIA Technologies, Inc., 204 F.R.D. 450, 452 (N.D. Cal. 2001). As Holcomb and Watson were properly identified as witnesses, the parties were not required to produce their affidavits in response to discovery requests. The parties, of course, are allowed to use the affidavits in their cross-examinations at trial.

---

[11]    Both Watson's affidavit and the Sheriff's Notice support Charter Oak's claim that the Pattersons did not reside at the Property at the time of the Fire.

The Pattersons admit that they did not identify Miller prior to the close of discovery, but assert that they only recently learned that he could assist them. Federal Rule of Civil Procedure 37 provides that if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Mitchell v. Ford Motor Co., 318 F. App'x 821, 824 (11th Cir. 2009).

Miller, in his affidavit, states that he has known Defendant Genevieve Patterson for over twelve years and has become good friends with her and Defendant Victor Patterson. (Miller Affidavit [125-8] ¶ 2). Miller also states that over the five years prior to the Fire, he saw the Pattersons at the Property regularly and occasionally spent the night there. (Id. ¶ 3). Miller states further that after the Fire he visited the Property with Defendant Genevieve Patterson to assist with reviewing the damage, and that he accompanied the Pattersons when they collected rent from the occupants of the Old Fountain Property. (Id. ¶¶ 5-6).

After review of Miller's averments, the Court concludes that the Pattersons cannot establish that their failure to disclose Miller earlier was substantially

justified.  The Pattersons claim that Miller came to them to offer to assist, but it is clear from his affidavit statements that he is close with the Pattersons and would have been known to have relevant information not only as to their living at the Property but also to their claim that the Old Fountain Property was rental property. The Pattersons have failed to satisfy their burden to show that their nondisclosure of Miller in their initial disclosures was substantially justified.[12]  Miller's affidavit must therefore be excluded.

Charter Oak asserts that the Sheriff's Notice is used solely for the purpose of impeaching Michael Golden ("Golden"), Defendant Genevieve Patterson's adult son and Defendant Victor Patterson's stepson.  Golden, in his affidavit, avers that he lived at the Property with the Pattersons at the time of the Fire.  (Golden Affidavit [125-7] ¶ 2).  The Sheriff's Notice provides that, on March 18, 2011, an officer was seeking to serve Defendant Victor Patterson at the Property in an unrelated suit, and was informed by Golden that Defendant Victor Patterson had not lived at the Property for approximately one year.  (Sheriff's Notice, Exhibit R

---

[12]     Even if substantially justified, Charter Oak has been harmed by the late disclosure.  It was unable during discovery to depose Miller to determine what, if any, information he had regarding the residency issue.  The Pattersons' claim that Charter Oak can depose Miller now is not consistent with the Court's scheduling order, under which discovery is now closed.  Miller was known to the Pattersons during the entirety of this litigation and was not disclosed to Charter Oak, precluding the use of Miller's testimony now.

[128-1] p. 1).  To the extent that the Sheriff's Notice is used solely for impeachment purposes, Charter Oak was not required to produce this document. See, e.g., Alphonso v. Esfeller Oil Field Const., Inc., 380 F. App'x 808, 810 (11th Cir. 2010).

      B.    Motion for Summary Judgment

          1.    Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State

Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    2.   Analysis

In its Motion for Summary Judgment, Charter Oak asserts that the Policy does not provide coverage because the Pattersons: 1) were not residing in the Property at the time of the Fire; and 2) made material misrepresentations to Charter

Oak during its investigation of the claim regarding: a) where they resided; and b) their claim for additional living expenses.

a)   <u>Residency</u>

It is undisputed that the Policy requires the Pattersons to reside at the Property to be entitled to any insurance proceeds.  Under Georgia law, if a policy requires an insured, as a condition of coverage, to reside at the property and the insured does not reside there, the insured cannot recover under the policy.  <u>See, e.g.</u>, <u>Varsalona v. Auto-Owners Ins. Co.</u>, 637 S.E.2d 64, 67 (2006).  The parties dispute whether the Pattersons had already moved to the Old Fountain Property, and were thus not residing at the Property at the time of the Fire.

Charter Oak refers to Defendant Victor Patterson's September 16, 2011 deposition obtained during a separate lawsuit between the Pattersons and CitiMortgage, Inc.[13]  At that deposition, the following testimony was elicited concerning the Old Fountain Property:

> Q:    At some point did you move into the Old Fountain Road property?
> A:    We did.
> Q:    When did you move into that property?
> A:    Probably by January of 2009.
> Q:    Why did you decide to move into the Old Fountain Road property?

---

[13]    Patterson, *et al.* v. CitiMortgage, Inc., *et al.*, Civ. No. 11-339 (N.D. Ga.).

> A:      We liked the property and, you know, the house and the property that it was on.
>
> Q:      Have you made any renovations or improvements to the Old Fountain property since you've lived there?
>
> A:      Only minor.
>
> Q:      Have you sold your prior residence?
>
> A:      No
>
> Q:      Does anyone live with you at the Old Fountain Road property?
>
> A:      Yes.
>
> Q:      Who lives with you there?
>
> A:      My wife, her daughter and two grandchildren.

(Exhibit G [99-3], p. 107, lines 20-25, p. 108, lines 1-14).  When asked about the status of the Property, Defendant Victor Patterson mentioned the Fire, which occurred five months prior to the deposition.  (Id., p. 108, lines 15-25).  Defendant Victor Patterson was also asked "[a]nd you moved into the Old Fountain Road property prior to the fire . . . at the Flowery Branch property," and Defendant Victor Patterson responded "[y]es."  (Id., p. 108, lines 24-25, p. 109, line 2). Defendant Victor Patterson also, in response to a question concerning any damages he suffered by any act of CitiMortgage, noted "[f]or one thing, it's extremely stressful when you're living in a home and you aren't expecting to receive a foreclosure notice."  (Id., p. 111, lines 12-17).

Contrary to Defendant Victor Patterson's September 2011 deposition testimony, at his deposition conducted on May 29, 2013 in this case, Defendant Victor Patterson testified that he has been living at the Old Fountain Property since

"November of 2011."  (Exhibit C [103-1], p. 7, lines 19-22).  Defendant Victor

Patterson also testified that he considered the Old Fountain Property to be his

"residence" because he owned it, though he did not live there.  (Id., p. 25, lines

11-22).  Defendant Victor Patterson testified that the Old Fountain Property was a

rental property.  (Id., p. 27, lines 16-18).

Charter Oak also relies upon Watson's affidavit.  Watson stated that at

"some point prior to the Fire, [the Pattersons] moved out of the Property . . . ."

(SOMF ¶ 11, Exhibit I [96-8] ¶ 6).[14]

The Pattersons assert that they resided at the Property at the time of the Fire.

The Pattersons, to contradict Defendant Victor Patterson's 2011 deposition

testimony, assert that his testimony was unclear as to who moved into the Old

Fountain Property.  (Response ¶ 2).  The Pattersons assert that when Defendant

---

[14]     Charter Oak also asserts that the Pattersons ceased paying their
homeowners' association dues for the Property in January 2009, the exact time that
they moved into the Old Fountain Property, and that Mr. Toby Breedlove
("Breedlove"), the former owner of the Old Fountain Property, testified in a
deposition that Defendant Victor Patterson informed him that he intended to sell
another property and move into the Old Fountain Property.  (SOMF ¶¶ 15, 17,
Exhibit H [96-6], p. 74, lines 1-5).  The Pattersons assert that they ceased paying
their homeowners' association dues in 2007 or 2008.  (Pattersons' Response to
SOMF [123] ¶15).  The Court notes that the non-payment of their homeowners'
association dues during a time that the Pattersons were indisputably having
financial difficulties does not establish that they had ceased to reside at the
Property.  The Court further notes that Breedlove went on to testify that he did not
know when the Pattersons moved into the Old Fountain Property.  (Exhibit H,
p. 74, lines 6-8).

Victor Patterson said that they "moved in," he meant that they moved renters into the Old Fountain Property.  (Response to SOMF ¶ 50).  The Pattersons also assert that Watson was not a close acquaintance of their family, and would not know whether the Pattersons continued to reside at the Property.  (Id. ¶ 11).

The Pattersons, in support of their assertion that they resided at the Property at the time of the Fire, rely upon their own affidavits, as well as the affidavits of: 1) Holcomb; 2) Renee Wymer ("Wymer"), Defendant Genevieve Patterson's adult daughter and Defendant Victor Patterson's stepdaughter; and 3) Golden.

Holcomb states that he rented and moved into one of the bedrooms of the Old Fountain Property in October 2010.  (Holcomb Affidavit [125-5] ¶¶ 2-3). Holcomb also states that at the time he rented the room, the Pattersons were not living at the house, and in April 2011, he had no knowledge of the Pattersons or their family living at the Old Fountain Property.  (Id. ¶¶ 5-6).  Wymer and Golden both state that they lived at the Property with the Pattersons at the time of the Fire. (Wymer Affidavit [125-6] ¶ 2; Golden Affidavit [125-7] ¶ 2).[15]

---

[15]     Charter Oak, in its Reply in support of its Motion for Summary Judgment, seeks to impeach Golden's averments, noting that the Sheriff's Notice establishes that on March 18, 2011, a month before the Fire, an officer seeking to serve Defendant Victor Patterson in a suit brought by the Pattersons' homeowners association was informed by Golden that Defendant Victor Patterson did not live at the Property and had not lived there for approximately one year.  (Reply p. 4; Exhibit R [128-1] p. 1).  Assuming, *in arguendo*, that Golden made this statement

After a careful review of the evidence presented by the parties, the Court concludes that a genuine issue of material fact exists regarding whether the Pattersons resided at the Property at the time of the Fire.  Charter Oak has submitted strong evidence to support its contention that the Pattersons did not reside at the Property when the Fire occurred.  The Pattersons have provided affidavits from several individuals, including one unrelated and apparently disinterested individual to support their contention that they did reside at the Property at the time of the Fire.  The Pattersons have also provided a weak alternative explanation regarding Defendant Victor Patterson's 2011 deposition testimony.  Whether the Pattersons' explanation for this testimony, or the witnesses they rely upon, are credible is for a jury, not the Court, to decide.  See Graham, 193 F.3d at 1282.  The Court concludes, however, that the issue of where the Pattersons resided at the time of the Fire is genuinely disputed, and for that reason Plaintiff's Motion for Summary Judgment is required to be denied based on this residency issue.

---

to the officer, the Court is not entitled to weigh Golden's credibility to determine if he was misleading the officer to assist Defendant Victor Patterson in evading service, or if Golden perjured himself when he executed his affidavit.  See Graham, 193 F.3d at 1282 ("[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . .").

b)     <u>Material Misrepresentations</u>

The Policy provides that no coverage for losses is allowed if:

> whether before or after a loss, one or more 'insureds' have:
>
> (1) Intentionally concealed or misrepresented any material fact or
>
> circumstance; (2) Engaged in fraudulent conduct; or (3) Made false
>
> statements.

([1-1] p. 8).  The Policy provides coverage for "any necessary increase in living expenses incurred by [the insured] so that [the insured]'s household can maintain its normal standard of living."  ([1-2] p. 10).  Charter Oak alleges that the Pattersons falsely decreased their pre-Fire living expenses and falsely increased their post-Fire living expenses to artificially inflate their claim under the Policy.[16]

The Pattersons claim to have spent an average of only $15 per day on food from September 2010 through April 2011.  (Motion for Summary Judgment p. 19; SOMF ¶¶ 21-23).  Charter Oak alleges that the Pattersons spent an average of $44 per day on food during this pre-Fire time period.  (Motion for Summary Judgment p. 19; SOMF ¶ 24).  This decrease, Charter Oak claims, was concocted to inflate the Pattersons' reimbursable post-Fire increase in living expenses.  (Motion for

---

[16]     Charter Oak also asserts that the Pattersons misrepresented their residence at the time of the Fire.  The Court has concluded that a genuine issue of material fact exists concerning where the Pattersons resided at the time of the Fire, the Court thus cannot conclude that the Pattersons misrepresented this material fact.

Summary Judgment p. 16).  Charter Oak further asserts that the Pattersons submitted and sought reimbursement for random receipts from restaurants for post-Fire expenses they did not actually incur.  (Id. ¶¶ 33-37).  Charter Oak claims that the Pattersons altered receipts to reflect purchase amounts greater than they incurred.  (Id. ¶ 43).

The Pattersons dispute that they misrepresented their pre-Fire expenses.  The Pattersons include a detailed summary of their pre-Fire expenses, including food expenses, in their Response to the Motion for Summary Judgment, which shows that their average monthly expense for groceries was $500 per month, or $16.67 per day, which is in line with those they submitted to Charter Oak.  (Exhibit I [125-11]).

The Pattersons do not dispute that they submitted receipts that were not theirs.  They contend that they incurred expenses for which they lost, misplaced, forgot, or damaged their receipts.  (Response to SOMF ¶ 34).  The Pattersons assert that they were not given any guidance from Charter Oak or the Policy as to how to document their expenses, and, to provide documentation of expenses they actually incurred but for which they did not have any receipts, they returned to restaurants at which they had eaten to get replacement receipts that were representative of the actual expenses they incurred.  (Id.).  The Pattersons also note

that they often paid in cash, and for which there is no electronic purchase record. The Pattersons assert also that they left tips in cash, and thus were not "altering" receipts but rather marking each to indicate the amount of the tip that was paid in cash.  (Id. ¶ 43).

The Pattersons have provided alternative evidence concerning their pre-Fire monthly expense and the alleged "altering" of receipts, and it is not the role of the Court to weigh the evidence.  See Graham, 193 F.3d at 1282.  While it is undisputed that the Pattersons submitted receipts that were not their own, they assert that these receipts are representative of expenses that they actually incurred -- and thus would be entitled to claim.

On the record before it, and without engaging in a determination of the Pattersons' credibility, it is unclear whether the Pattersons are seeking to fraudulently obtain additional insurance proceeds through the submission of the receipts, or whether they sought to provide receipts that were representative of their actual expenses.  Defendant Victor Patterson, in his deposition testimony, admitted that the receipts were not the Pattersons' receipts but receipts that were representative of expenses the Pattersons actually incurred.  (Exhibit C [104-1], p. 105, lines 20-25, p. 106, lines 1-25, p. 107, lines 1-21).  The Court cannot conclude whether the Pattersons intentionally "misrepresented" any material

facts,[17] or engaged in fraudulent conduct, or made false statements, and this disputed issue of material fact must be determined by a jury.  Defendant's claim for summary judgment on this ground also must be denied.

     C.    Motion to Enforce Settlement

EWF, in its Settlement Motion, asserts that Ben Chastain, Esq. ("Chastain"), counsel for the Pattersons at the relevant time, agreed to settle the parties' respective claims whereby: 1) the Pattersons would consent to a release of the funds being held by BOA that were owed to EWF for cleaning and storing the Pattersons' personal possessions, as well as the funds that had been returned to Charter Oak; 2) EWF and the Pattersons would execute a mutual general release of all claims; and 3) EWF and the Pattersons would dismiss with prejudice their respective claims against each other.  (Settlement Motion pp. 4-5).  EWF asserts that their counsel, Edgar S. Mangiafico, Jr., Esq.  ("Mangiafico"), proposed the above settlement terms to Chastain at the initial session of the Pattersons' depositions.  (Id.).

On June 12, 2013, Chastain sent Mangiafico an e-mail stating that the "Pattersons will agree to settle the claims . . . on the terms we've discussed."

---

[17]    The amount of living expenses incurred and claimable under the Policy is a material fact.  See, e.g., Perspolis, Inc. v. Federated Mut. Ins. Co., 03-cv-2456, 2006 WL 826469, at *2 (N.D. Ga. Mar. 28, 2006).

(Affidavit of Edgar S. Mangiafico, Jr. [69-2] ("Mangiafico Affidavit") ¶ 8, Attachment B).  On June 13, 2013, Mangiafico sent Chastain an e-mail that included the proposed mutual release agreement, and asked Chastain to review it and, if there were no changes, to send it to the Pattersons for execution. (Mangiafico Affidavit ¶ 11, Attachment E).  On June 18, 2013, Chastain responded to Mangiafico's June 13, 2013 e-mail, stating that he had sent the mutual release to the Pattersons for execution.  On June 24, 2013, Mangiafico sent a follow-up e-mail to Chastain and, on June 26, 2013, Chastain responded, asking that the mutual release be amended to only release the claims asserted in this lawsuit. (Mangiafico Affidavit ¶¶ 14-15, Attachments H, I).  On June 26, 2013, Mangiafico responded, noting that the agreement was for a mutual general release, and that the originally proposed settlement called for a general release to prevent future litigation between the parties.  (Mangiafico Affidavit ¶ 15, Attachment I).  On July 1, 2013, Chastain e-mailed Mangiafico, informing him that the "Pattersons have clarified their positions and understanding, and agree to execute the release and settlement agreement you sent previously . . . ."  (Mangiafico Affidavit ¶ 16, Attachment J).  Chastain promised to have the signed copy of the settlement agreement to Mangiafico by July 2, 2013.  (Id.).  On July 3, 2013, Mangiafico e-mailed Chastain to ask when he could expect the signed release, and Chastain

responded that Chastain would have it momentarily and that he would deliver it to Mangiafico.  (Mangiafico Affidavit ¶ 17, Attachment K).

Chastain also acknowledged the settlement in a July 2, 2013, e-mail regarding a proposed stipulation between the Pattersons, EWF, Charter Oak, and BOA, to allow BOA to release to EWF the funds it held for EWF's post-Fire clean up and repair.  (Mangiafico Affidavit ¶ 19, Attachment L).  In that e-mail, Chastain stated that the consent order to release the funds was acceptable, and that the stipulation also was acceptable, with one minor revision.  (Id.).  Chastain stated that "in light of the settlement agreement reached between the Pattersons and EWF . . . we approve this language.  [Mangiafico] and I will let you all know when the release has been fully executed by the necessary parties."  (Id.).

On July 22, 2013, Chastain filed a Response in Opposition [75] to the Settlement Motion on behalf of the Pattersons.  In this Response, Chastain noted that, on July 1, 2013, he informed the Pattersons that he intended to withdraw as their counsel.  (Response p. 2).[18]  Chastain noted that the Pattersons did not dispute the correspondence between him and Mangiafico, but dispute that there was a

---

[18]     On July 22, 2014, Chastain filed a motion to withdraw as counsel [74] ("Motion to Withdraw") based upon "irreconcilable differences regarding the course and conduct of this matter" and the Pattersons being "delinquent in payments . . . ."  (Motion to Withdraw p. 1-2).  On August 1, 2013, the Court granted [85] Chastain's Motion to Withdraw.  The Pattersons did not obtain new counsel and are proceeding *pro se*.

"meeting of the minds" to create a binding settlement agreement.  (Id. p. 2).

Chastain requested that the Pattersons be given additional time to respond to the

Settlement Motion so that they could obtain new counsel.  (Id. p. 2-3).[19]

On January 21, 2014, the Pattersons filed their Response [95] to the

Settlement Motion.  In it, the Pattersons explain that they never agreed to the

mutual release of all claims and that there was never a meeting of the minds to

create an enforceable settlement agreement.  The Pattersons note that they do not

dispute the communications referenced in the Settlement Motion.  (Response p. 9].

The Pattersons claim that Chastain attempted to pressure them into signing the

release, despite their reservations.  (Id. pp. 6-7).  The Pattersons, however, do not

dispute that Chastain agreed to the proposed settlement agreement.

A review of the correspondence between Chastain and Mangiafico

establishes that the attorneys had reached a settlement agreement based upon the

language proposed by Mangiafico, which included a mutual general release.  The

Pattersons do not dispute a settlement was reached.  The Pattersons only dispute

---

[19]     The Pattersons filed two motions to extend the time for them to respond to
the Settlement Motion.  [76, 77].  On August 5, 2013, the Court extended the
Pattersons' time to respond to August 26, 2013.  On August 29, 2013, the
Pattersons filed a Notice of Bankruptcy [89], staying this litigation.  The automatic
stay was subsequently lifted and, on December 23, 2013, the Court set
January 20, 21014 as the deadline to respond to the Settlement Motion.

that they personally agreed to these terms, regardless of Chastain's correspondence with Mangiafico.

It is well-settled under Georgia law an "attorney's consent to [a settlement] agreement is binding on his client." Cannady v. Automatic Data Processing, Inc., 05-cv-2855, 2006 WL 3422424, at *2 (N.D. Ga. Nov. 28, 2006) (citing Wong v. Bailey, 752 F.2d 619, 621 (11th Cir. 1985)).  "An 'attorney who has an attorney-client relationship with a party has apparent authority to enter into an agreement on behalf of his client and the agreement is enforceable against the client by the other settling parties.'" Id. (quoting Pembroke State Bank v. Warnell, 266 Ga. 819, 821 (1996)); see also Glazer v. J.C. Bradford & Co., 616 F.2d 167, 168 (5th Cir. 1980) ("Under Georgia law, an attorney is cloaked with apparent authority to enter into a binding agreement on behalf of a client.  Such a settlement agreement may be enforced against the client by the other settling parties.").  An attorney may bind his client to a settlement agreement even if the client did not authorize the attorney to enter into the settlement.  Cannady, 2006 WL 3422424, at *2 (citing Wong, 752 F.2d at 621).

The Georgia Court of Appeals has enforced settlement agreements entered into by counsel for parties even when the party fired the attorney prior to the date the agreement was finalized.  Clark v. Perino, 509 S.E.2d 707, 712 (1998).  The

court in Clark noted the opposing party was entitled to rely upon the apparent authority of the attorney to enter into a settlement.  Id.  "In other words, where the dispute as to an agreement is not between opposing parties but is, rather, between the attorney and client over the attorney's authority, and where the opposite party is ignorant of any limitation upon the attorney's authority, the client will be bound by his attorney's actions."  Id. (quoting Brumbelow v. Northern Propane Gas Co., 308 S.E.2d 544).

The Pattersons state now that they did not agree to a mutual release and to the specific language in the proposed settlement agreement.  They are nonetheless bound by Chastain's representations that an agreement had been reached and that the only step remaining was execution.  See, e.g., Cannady, 2006 WL 3422424, at *2.  The rule outlined in Clark "focuses on the interests of opposing parties and puts the burden of communicating any limitation of an attorney's authority on the party seeking to disavow the settlement."  See Clark, 509 S.E.2d at 712.  The Pattersons do not contend that Chastain did not have authority to negotiate a settlement with EWF and that they communicated to EWF any limitation on Chastain's authority or that they did not agree to the settlement.  The Pattersons are, under Georgia law, bound by the representations Chastain made in his

representation of them.[20]  To the extent that Chastain disregarded their instructions and exceeded his authority, the Pattersons' claim is against Chastain, and not EWF. See, e.g., id.

      D.      Motion to Strike Pattersons' Expert

The Pattersons have identified Defendant Victor Patterson as an expert witness.  (Supplemental Initial Disclosures [94] p. 5).  Defendant Victor Patterson is a CPA and "has first had (sic) knowledge of the additional living expenses." (Id.).  Charter Oak asserts that Defendant Victor Patterson would be an "unreliable" expert witness due to his financial interest in the outcome of this case,

---

[20]      EWF, in its Settlement Motion, also requests that the Court sanction the Pattersons and require them to pay EWF's expenses for preparing the Settlement Motion for acting in "bad faith" by delaying the consummation of the settlement. The Court has the inherent power to impose sanctions against attorneys or clients, or both, who act "'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Byrne v. Nezhat, 261 F.3d 1075, 1106 (11th Cir. 2001) (quoting Chambers, 501 U.S. at 45-46), abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008).  The threshold inquiry for whether sanctions should be imposed based on the Court's inherent power is a finding of bad faith.  Byrne, 261 F.3d at 1106 (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) ("[t]he key to unlocking a court's inherent power is a finding of bad faith.")). "Because the court's inherent power is so potent, it should be exercised with restraint and discretion."  Id. (internal quotation marks omitted).

While the Pattersons' belief that the settlement agreement was not binding because there was no "meeting of the minds" between them and EWF is incorrect, the Court is unable to find, on the record before it, that the Pattersons acted in bad faith on this matter, or unreasonably or vexatiously multiplied the proceedings on this matter.

and due to the allegations that he engaged in fraudulent conduct with regard to the

Policy.  (Expert Motion p. 3-5).[21]

       While Charter Oak has couched its objection to Defendant Victor

Patterson's expert testimony as a concern for reliability, it is in fact an objection

based upon the perceived bias of his testimony.  Bias in an expert witness's

testimony, unlike reliability, is a credibility issue for the jury, and not a reason for

the Court to exclude the expert's testimony or report.  See Adams v. Lab. Corp. of

Am., 13-10425, 2014 WL 3724190 (11th Cir. July 29, 2014); see also

Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 59 (1st Cir.

2010)("Assessing the potential bias of an expert witness, as distinguished from his

or her specialized training or knowledge or the validity of the scientific

underpinning for the expert's opinion, is a task that is properly left to the jury")

(internal quotations omitted).

---

[21]    Charter Oak does not assert that an expert is unnecessary in this case and, aside from a brief footnote, does not assert that Defendant Victor Patterson is otherwise unqualified to be an expert.

### III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Charter Oak's Motion to Strike Affidavits of Larry Holcomb and Walter Miller [126] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to the affidavit of Walter Miller.  It is **DENIED** with respect to the affidavit of Larry Holcomb.

**IT IS FURTHER ORDERED** that Defendant Genevieve Patterson's and Victor W. Patterson's Motion to Strike Affidavit of Emily Watson and Sheriff's Service Notice from Four Seasons on Lanier Homeowners Association, Inc. [133] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Charter Oak Fire Insurance Company's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Emergency Water & Fire Restorations, Inc.'s Motion to Enforce Settlement [69] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to the enforcement of the settlement agreement reached by former counsel for Genevieve Patterson and Victor W. Patterson and counsel for Emergency Water & Fire Restorations, Inc.  It is **DENIED** with respect to the request for sanctions.

**IT IS FURTHER ORDERED** that Plaintiff Charter Oak's Motion to Strike

Defendants' Expert [102] is **DENIED**.

**SO ORDERED** this 11th day of September, 2014.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE